YATES *v*. STATE

No. 43202 December 14, 1964 169 So. 2d 792

*Darryl A. Hurt,* Lucedale, for appellant.

*G. Garland Lyell, Jr.,* Asst. Atty. Gen., Jackson, for appellee.

Kyle, P. J.

This case is before us on appeal by Phillip Yates from a judgment of the Circuit Court of George County sentencing the appellant to suffer death in the manner provided by law for the murder of Jerry Gordon, a young employee of the Kayo Service Station at Lucedale, Mississippi.

The appellant was indicted by the grand jury at the February 1964 term of the court. The indictment alleged that the crime had been committed on January 27, 1964. The indictment was returned on February 18, 1964, and a capias was issued on the same date. The appellant was brought before the court and stated to the court that he had no counsel to defend him, and that he was unable to employ counsel. An order was thereupon entered by the court appointing Darryl A. Hurt and J. O. Moss, members of the Bar of George County, to represent the defendant in the trial of the case. The defendant was later arraigned in open court and in the presence of his counsel upon the charge of murder pre-

ferred against him, and for plea to the charge stated that he was guilty.

The record shows that, before the court accepted the defendant's plea of guilty the district attorney informed the court that the State could not recommend life imprisonment in the state penitentiary due to the seriousness of the crime and would insist upon the death penalty. The court then cautioned the defendant as to the consequences of his plea and informed him that if he entered a plea of guilty it would be necessary to empanel a jury, and the jury would decide whether the defendant would be punished by the imposition of a death sentence, which meant death in the gas chamber, or life imprisonment in the state penitentiary.

After a half hour recess Darry A. Hurt, the attorney first appointed by the court to represent the defendant, informed the court in chambers that during the recess he had counseled with the defendant as to the consequences of his plea of guilty and had informed the defendant that, in his opinion, he would be better able to defend him on a plea of not guilty than on a plea of guilty, setting out the dangers of such plea. The trial judge thereupon resumed his seat on the bench, and in open court stated to the defendant that he wanted to be sure that his plea of guilty was free and voluntary; that if he entered a plea of guilty to the charge of murder it would be the duty of the court to see that a fair and impartial jury was empaneled to determine what type of penalty the defendant would receive, and that would be whether the defendant would suffer death in the gas chamber or would receive a sentence of life imprisonment. The trial judge asked the defendant whether he understood the statement made to him. The defendant answered that he did understand. The defendant was then asked whether it was still his desire, after talking to his attorney, to plead guilty to the charge of murder. The answer was that it was his desire to plead guilty.

The court then asked the defendant to state his age and the amount of education that he had received. His answer was that he was 21 years of age, and that he had reached the eleventh grade in school.

The court then asked Mr. Hurt whether he had advised with the defendant, talked to him in private, and explained in detail the consequences of the plea. Mr. Hurt stated that he had done that, and he was satisfied that the defendant understood the seriousness of the plea. The court then stated to the defendant, "I accept your plea of guilty in these cases." In No. 1376, wherein you enter a plea of guilty to the charge of murder, in No. 1377, wherein you enter a plea of guilty to the charge of armed robbery, and in No. 1378, wherein you enter a plea of guilty to the charge of kidnapping. "I am satisfied in my mind that you understand the seriousness of your plea, and that the plea you make is free and voluntary on your part." The court then asked the defendant whether anyone had promised him anything or threatened him. His answer was, "No, sir." The court then announced that he had no doubt in his own mind that the defendant's plea was free and voluntary and should be accepted by the court, and that 75 names would be drawn from the jury box and a special venire facias would be issued in Cause No. 1376, commanding the sheriff to summons the persons whose names were so drawn to appear as prospective jurors, and a jury would be empaneled to determine the type of punishment which the defendant should receive. The court was then adjourned until Friday, February 21.

When the court reconvened on Friday, February 21, the defendant's attorneys filed a motion for a continuance of the cause until the next term of the court, and in support of the motion for a continuance the defendant's attorneys attached thereto an affidavit, signed by the attorneys, in which they alleged facts as follows:

That the defendant was apprehended and arrested Saturday morning, February 15, 1964; that the grand

jury, which had convened on February 10, was recalled on February 18 and the defendant was indicted during the forenoon of that day for the crime charged against him; that Darryl A. Hurt, the court-appointed attorney, saw the defendant for the first time in the George County jail on the morning of February 18, and conferred with him in the jail cell for a little less than thirty minutes prior to his arraignment; that J. O. Moss was later appointed as associate counsel for the defendant, and during the afternoon of February 19 the two attorneys for the first time had opportunity to interrogate the defendant and advised with him in the Jackson county jail at Pascagoula, in Jackson County; that during the limited interview which counsel had with the defendant they had cause to believe that the defendant had a meritorious defense, the defendant actually being insane; and that the motion for a continuance filed by them in the cause was not filed for the purpose of seeking delay only, but that justice might be done. It was also stated that the affidavit attached to the motion for a continuance was being made by counsel for and on behalf of the defendant for the reason that the defendant was confined in the Jackson County jail, and there was no opportunity for the defendant personally to sign the affidavit prior to the submission of the affidavit to the court.

The two attorneys further alleged in their affidavit that the limited investigation which they had made showed that the defendant had been discharged from the Military Service of the United States (U. S. Air Force) in October 1960, for psychiatric reasons, the defendant having been found to be mentally incompetent by three psychiatrists, a major and two captains whose names were unknown to counsel at the time of making the affidavit; that report of the Air Force medical officers should appear on the defendant's service record, which counsel had been informed was on file in the Air Force

headquarters at St. Louis, Missouri; that the names and whereabouts of the three medical officers must be ascertained and the officers interviewed by counsel, in order that counsel might properly prepare the defendant's case for trial; that counsel was under a duty to make every effort possible to have the above mentioned medical officers testify during the hearing, if their testimony should appear to be of value to the defendant who was charged with a capital crime; that ascertaining the names of the three Air Force medical officers and their places of residence, and obtaining the original or copies of the defendant's Air Force service record would require several weeks time; that there were also other witnesses for the defendant whom counsel had not had time or opportunity to interrogate, and to contact and interview these witnesses would require at least two or three weeks time.

The attorneys further alleged in their affidavit that the court had accepted the defendant's guilty plea, and the only remaining question to be determined by the court was the extent of punishment to be inflicted, whether life imprisonment in the state penitentiary or execution; that never before in the history of the State of Mississippi had a jury been called upon to fix the punishment in a capital case where the defendant had entered a plea of guilty as charged in the indictment; that the limited investigation thus made by the defendant's attorneys had caused them to doubt that the defendant was sane, and the attorneys should be afforded several weeks time within which to investigate and resolve to their satisfaction the question as to the defendant's sanity, and to determine whether or not the defendant should base his defense on the ground of insanity.

The defendant's attorneys filed along with their motion for continuance a motion for permission to have the defendant examined by at least two privately prac-

ticing psychiatrists to be selected by the defendant's
counsel. In support of that motion the defendant's at-
torneys stated that the issue of the defendant's sanity
would be the principal issue to be determined in the trial
of the case, in fact the sole issue; that the defendant's
history and his acts at the time of the commission of
the crime charged against him and subsequent to his
arrest were such as to justify a court order that he
be examined by at least two competent phychiatrists
selected by his own counsel for the purpose of determin-
ing whether or not in their opinion the defendant was
sane or insane.

The defendant's attorneys further stated on infor-
mation and belief that the defendant had suffered two
serious head injuries when he was a child and had short-
ly thereafter begun to exhibit tendencies to commit acts
of violence and inflict bodily harm on others; that fol-
lowing his head injuries, when the defendant was under
15 years of age, he had threatened to kill the deputy
sheriff of Stone County, and within a short time there-
after in a violent fit of rage he intentionally shot his
father's horse with a rifle, and when not more than 16 or
17 years of age he shot at his father with a 22 rifle
with intent to kill him; that the defendant at the age
of 18 years had enlisted in the United States Air Force
for a period of four years with the consent of his par-
ents, said enlistment occurring in the latter part of
the year 1959; that after completing his basic training
at Lackland Field, San Antonio, Texas, the defendant
was stationed at Chanute Field in the State of Illinois,
and there became involved in difficulties with his com-
manding officer and his first sergeant, and was court-
martialed and given a suspended sentence of imprison-
ment in the stockade; that because of his courtmartial
and difficulties at Chanute Field the defendant was
transferred and reassigned to duty at Amarillo Air Force
Base, Amarillo, Texas; that while in training at the Am-

arillo Air Force Base, the defendant became insensed over the attentions being paid by a Negro service man to Caucasian females, and attempted to do bodily harm to or to kill the Negro service man with a razor blade; that the defendant was arrested and courtmartialed and was given a sentence of 30 to 60 days in the stockade for that offense, but was not required to serve the sentence; that the defendant also became involved in other difficulties which finally resulted in his being examined by three psychiatrists who determined that the defendant was undesirable for a serviceman in the United States Air Force, and upon the recommendation of the three psychiatrists the defendant was discharged from the Air Force in October 1960 as undesirable, although the period for which he had enlisted was four years.

It was further alleged by the defendant's attorneys in their motion that the undisputed facts of the alleged crime with which the defendant was charged showed that the defendant committed the homicide without any moral or sane motive, cause or reason therefor; that the homicide was committed by the defendant because and by reason of a sudden almost instantaneous impulse to shoot and kill, the defendant only a moment prior to the shooting having no intent to commit homicide.

The defendant's attorneys further averred in their motion for a psychiatric examination of the defendant, that the defendant, on being questioned by the officers after his arrest by the Sheriff of Jackson County on Saturday, February 15, refused to make any confession whatsoever, but a few hours later called for his minister or preacher, Reverend George C. Buckly, a minister of the Holiness Faith, and Jackson County officers went to the residence of the Reverend George C. Buckly in George County, for the purpose of having him go to the Jackson County jail. The defendant's counsel on information and belief averred that the preacher was

told or requested by said officers to tell the defendant that, if the defendant would confess and plead guilty to the murder of Jerry Gordon, the defendant could be given a sentence of no more than life imprisonment from which he would be released in a period of not more than seven to fifteen years; and further that counsel had been informed and believed and thereupon averred that the Reverend Mr. Buckly, in privacy with the defendant in a cell in the Jackson County jail, informed the defendant that, if he would confess and plead guilty when arraigned, he would receive no more than than a life sentence from which he would be released in not more than ten to fifteen years; and that the defendant, being only 21 years of age and without further counsel, thereupon confessed privately to the Reverend Mr. Buckly; that no attorney had seen or counseled with the defendant until a few minutes prior to his arraignment, and the defendant at that time was adamant in his belief that he should plead guilty.

The defendant's attorneys therefore urged in their motion that competent psychiatrists to be selected by the defendant's attorneys be permitted to examine the defendant for a sufficient length of time to determine whether or not in their opinion the defendant was sane or insane, and that the court order that the expense incurred in having such examination made be paid out of the county treasury.

The above mentioned motion for an examination of the defendant by psychiatrists was filed on February 21, 1964, as stated above, and was heard on the same day. Upon the hearing of the motion the Reverend George C. Buckly testified that he had known the defendant for three or four years; that the defendant sent for him before making any confession to the officers on February 15, and he went immediately to the jail in the City of Pascagoula and talked to the defendant; that he also talked to Sheriff Eugene C. Howell of George

County and J. B. Gibson, Chief of Police of the City of Pascagoula, who had questioned the defendant to a limited extent prior to the witness' arrival at the jail. The witness was then asked to state his opinion as to the defendant's sanity or insanity. His answer was: "In my opinion there is something that has affected the boy that comes by spells. I see times that I find the boy as fine a young man as I have ever dealt with in my life. I see other times he appears to be dangerous." The witness was asked: "In your opinion do you believe the boy, the defendant, at all times knows the difference between right and wrong?" His answer was: "No Sir, I don't."

The defendant's father and mother, Mr. and Mrs. Jefferson T. Yates, both testified that the defendant had fallen on a concrete sidewalk when he was about 10 years of age, and had struck his head on the sidewalk with such force as to render him unconscious for 30 or 40 minutes; that the defendant had suffered another severe head injury several years later while he was helping his father cut paperwood; that a piece of timber 8 inches in diameter and 5 feet 4 inches in length struck him in the face and some of his teeth were knocked out; that he was rendered unconscious as a result of the blow; that after this second injury the defendant "was not himself" part of the time. He did not act like a normal person and gave his father much trouble. Both parents referred to numerous difficulties in which the defendant had become involved during the later years of his life. On one occasion, in a fit of anger, he struck his father with a hatchet. On another occasion he shot at his father but didn't hit him. His mother took the rifle away from him. He enlisted in the United States Air Force when he was about 18 years of age, and was given an "undesirable discharge" at the end of nine months.

Without waiving his immunity from being compelled to testify as a witness against himself, the defendant

was called to testify as a witness in his own behalf during the hearing on the motion for an examination by psychiatrists. The defendant was questioned at length concerning the injuries which he had received during his early life, the display of temper and actual ill-will which he had manifested at times toward his father and other people with whom he had been associated. The defendant was then questioned concerning his enlistment as a member of the United States Air Force, the difficulties in which he had become involved as a member of the Air Force, the courtmartial proceedings instituted against him, which finally resulted in his examination by the Air Force Medical officers and his discharge from the Air Force as "Undesirable to the Government." The defendant stated that his discharge papers were burned when his father's house on Halsberry Road was destroyed by fire on February 10, 1963; that he had all of his medical papers in an envelope in a dresser drawer, and they were all burned. He stated that he was receiving no disability pension of any kind. "They said if there was anything wrong with me, it didn't happen after I came in the service."

The court, after hearing the testimony offered on behalf of the defendant in support of the motion for a psychiatric examination found that an examination should be made to determine whether or not the defendant was mentally capable of making a rational defense to the crime charged against him, and whether or not the defendant knew the difference between right and wrong at the time the crime was committed. The court therefore ordered that Dr. George Wilson, a psychiatrist, residing in the City of Gulfport, examine the defendant who was being held in the Jackson County jail, and determine whether or not the defendant had the mental ability to conduct a rational defense, and whether or not the defendant knew the difference between right and wrong on the date the crime was com-

mitted. The court at the same time overruled the defendant's motion for a continuance, and entered an order upon its minutes extending the February term of the court for four additional weeks.

On February 25, 1964, the court received a written report from Dr. George Wilson, the psychiatrist, stating that in his opinion the defendant was mentally capable of conducting a rational defense, and upon receipt of that report the court entered an order directing that the report be made a part of the record and that the trial of the defendant proceed.

The defendant's attorneys then filed a motion for a change of venue on the ground that the defendant could not have a fair and impartial trial by reason of the prejudgment of the case and by reason of grudge and ill will toward the defendant in the public mind. A hearing was had on that motion and the motion was overruled.

The district attorney thereupon again advised the court that in his opinion the facts in the case were such as to warrant the imposition of the death penalty, and on behalf of the State demanded that the issue of punishment, whether the defendant should suffer the death penalty or be imprisoned in the state penitentiary for the term of his natural life, be submitted to a jury. The trial judge in open court then drew one hundred names of persons from the jury box to serve specially as jurors in the trial of the case; and the clerk was ordered to issue forthwith and deliver to the sheriff a writ of Venire Facias, commanding him to summons the persons named to appear before the court at 9:00 A.M. on February 27, 1964, to serve as jurors in the trial of the case. On February 27, the court entered an order on its minutes directing that 25 additional jurors be summoned to serve on the special venire. A jury was then empaneled for the trial of the issue and placed in charge of special bailiffs. The trial was then

begun and completed on February 28. Eighteen witnesses were called to testify for the State. Two witnesses and the defendant himself testified on behalf of the defendant.

The jury after hearing the evidence, the instructions of the court and the arguments of counsel, retired to consider their verdict and presently returned into open court a verdict fixing the punishment of the defendant as death. A judgment was therefore entered sentencing the defendant to suffer death in the manner provided by law on the third day of April 1964.

On February 29 the defendant's attorneys filed a motion for a new trial, and an order was entered the same day overruling the motion. From the judgment entered against him and the order overruling his motion for a new trial the defendant has prosecuted this appeal.

In view of the nature of the points argued as grounds for reversal of the judgment of the lower court it is necessary that we give a brief summary of the testimony.

The testimony shows that Jerry Gordon, the deceased, was 18 years of age at the time of his death. Jerry was employed as a night operator of the Kayo Service Station, which was located on the outskirts of the business section of the Town of Lucedale. When the manager of the service station came to work about 6:00 o'clock on Monday morning, January 27, he found that Jerry Gordan was missing. His automobile was still parked on the service station lot. The city police began an investigation and notified the sheriff's office. Sheriff Eugene C. Howell of George County testified that he received several leads which proved to be worthless. The first lead of real value came to him from Mace Dewitt, who lived in Pritchard, Alabama, and was well acquainted with the defendant, Phillip Yates. Dewitt brought to the sheriff's office a book of trading stamps like the trading stamps given to customers at the Kayo

Service Station. Dewitt was married to the daughter of Mr. and Mrs. Oscar Dillard, who lived in Mobile, and Yates was rooming at their house at the time of Gordon's disappearance. Dewitt testified that he had received the stamps from Mrs. Dillard on a Sunday about the first of February. Mrs. Dillard testified that she found the book of stamps in one of the pockets of Yates' soiled clothes when she was preparing to wash the clothes, and that she delivered the stamps to her son-in-law after he heard that the Kayo Service Station had been robbed. Mrs. Dillard testified that she later found a .38 Smith and Wesson pistol in the soiled clothes hamper in her bathroom; that Yates brought the gun in with the clothes. The pistol was later properly identified and was introduced in evidence during the trial.

Sheriff Howell testified that after he received the book of trading stamps he continued his investigation and in time learned that Yates was in Kalmazoo, Michigan, and that Yates was also wanted by the police officers in Mobile. Yates was arrested in Kalamazoo, Michigan, on February 11. The sheriff's department of Mobile, Alabama, was notified of the arrest and Sheriff Howell and officer Tom Dees of the Sheriff's department of Mobile County went to Kalmazoo and brought Yates back to Mobile two days later. Yates escaped from Dees' automobile during the early morning of February 14 while the officers were transporting him from the airport to the county jail, and the next time Sheriff Howell saw him he was in the custody of the Sheriff of Jackson County.

Sheriff Cecil Byrd of Jackson County testified that Yates was recaptured by him and two of his deputies during the early morning of Saturday, February 15. He was tired and sleepy and had taken refuge in his father's barn near the Howell Bridge in George County. He offered no resistance when he was arrested. He was taken to the Jackson County jail in Pascagoula, and

was questioned during the afternoon by the county attorney of George County and the chief of police of the Town of Lucedale. Sheriff Howell was also present. Yates stated that he would tell the officers all about Jerry Gordon, but he wanted to see his preacher first. He also requested that he be permitted to talk to J. B. Gibson, Chief of Police of the City of Pascagoula.

Chief of Police Gibson testified that when he arrived at the jail, Yates asked him whether he had called Reverend Buckly. He told Yates that he had called Mr. Buckley. During the questioning Gibson asked Yates about Jerry Gordon, and Yates said: "Well, I am not saying whether I am guilty or not, or whether I know anything about it or not." He then added, "If I were guilty, what would be the penalty, what punishment would I receive?" Gibson said: "Well, you can receive the death penalty, or you can receive life." Gibson testified that he told Yates that if he was guilty, he should reveal it to take the burden off of himself, take the burden off of his mother and father, and also the Gordon family. Gibson stated that he told Yates that he "could tell that something was bothering him, he showed it, the muscles in his jaws were working, you've got something on your mind and the best thing to do is to get it off." Yates finally said, "Well, I will tell you this. I killed the boy. He's in the Kirkland Pasture." He said, "I will go show you where the body is at after I talk to Reverend Buckly. I want to talk to him. Will you go get him?" Gibson said that he would.

Reverend George C. Buckly testified that Sheriff Howell came to his house Saturday night and told him that Yates, who was referred to by the witness as "Sonny Boy", wanted to see him and talk to him; that he went with the sheriff to the jail in Pascagoula immediately; that while he was en route to the jail the sheriff led him to believe that Yates wanted to confess; that when he arrived at the jail he talked to Yates privately, and

Yates told him that he was guilty. Buckly then asked Yates whether he would go with the officers and show them where the body was. Yates asked Buckly whether he would go with him, and Buckly told him that he would. Buckly testified that he said to Yates: "I want you to tell these officers the truth * * * Sonny Boy, pay the price. If it means death, pay the price. I don't believe you will get anything but life by your confession, but if it means death, pay the price." Buckly stated that he went with the defendant and the officers to the place where the body was found. So far as Buckly knew, no one (other than Yates) knew where the body was until Yates took the officers out there and showed them where the body was located.

The testimony of other witnesses shows that later during the night Sheriff Byrd was informed that Yates was ready and willing to show the officers where the body of Jerry Gordon could be found, and Byrd made arrangements to transport Yates to the scene of the homicide. Police Chief J. B. Gibson drove the patrol car. Yates rode on the back seat with Sheriff Byrd and the Reverend George C. Buckly. Sheriff Howell rode on the front seat with Police Chief Gibson. Yates directed the officers to the scene of the killing in a wooded area in or near the Kirkland Pasture. Yates directed the officers to turn to the left on a log road which was overhung by pine trees and brush. Yates finally told the driver to stop. He then said, "No, move on down, it is a little bit further down," and the driver moved on. Yates again directed the driver to stop, and said, "He's under that pile of trash out there." The body, well hidden under the brush and undergrowth, was found at the place pointed out by Yates. Sheriff Byrd testified that Yates explained in detail how he had killed the deceased. He said that he had shot him in the side of his head the first time; then Gordon appeared to be struggling and acting like he was trying to get up, and

he shot him in the back of the head; that he then pulled the body off the traveled part of the roadway and covered it over with brush.

In addition to the oral confessions made by the defendant to the officers during the night of February 15, the defendant on February 16 signed a confession written by himself, which has been made a part of the record on this appeal. In his written confession the defendant stated that he left Deer Park, Alabama, on Sunday, January 26, 1964, in a truck which he had rented in Mobile; that he arrived in Lucedale about 2:00 o'clock Monday morning, and drove into the Kayo Service Station where Jerry Gordon worked; that he told Gordon to fill the truck tank with gasoline, and while Gordon was putting the gasoline in the truck, he took the pistol out of the dashboard pocket of the truck; that he then told Gordon he wanted four cartons of cigarettes, and when Gordon brought the cigarettes to him, he opened the door of the truck on the right side and told Gordon to get in. The defendant stated that he then drove down Highway 98 toward Mobile about six miles, and then turned South on the Shipman Road and proceeded about five miles. He then turned left on the Laconia Road where he bogged down in a mudhole. He then told Gordon to give him the money that he had. The amount was $116. The defendant stated that after he got bogged down he got scared and did not know what to do, and he decided to kill Gordon. Gordon asked the defendant where he was going. The defendant told him that there was a man who lived down the road that had a tractor. Those were the last words he said to Gordon. The defendant stated that he then pulled the gun which he had in his belt and shot Gordon in the side of the head, and when it appeared that Gordon was trying to get up he shot him again.

The appellant's attorneys have assigned and argued six points as grounds for reversal of the judgment of the lower court.

The main point assigned and argued as ground for reversal of the judgment is that the court committed reversible error in overruling the appellant's motion for a continuance of the cause until the next term of the court; and in view of the conclusion that we have reached on that point, it is not necessary that we discuss in detail each of the remaining points listed in the appellant's assignment of errors.

In discussing a motion for continuance on the ground of want of time for accused's counsel to prepare for trial in a case of this kind the textwriter in 22 A C.J.S. *Criminal Law* section 496b (1961), says:

"Ordinarily, a motion for a continuance on the ground of want of time for accused's counsel to prepare for trial is addressed to the sound discretion of the court, and the court in the exercise of its discretion should consider the facts and circumstances of the particular case. In the absence of an abuse of such discretion to the prejudice or disadvantage of accused, such motion may be properly refused, especially where, from the nature and character of the case as disclosed by the record, it is apparent that ample time has been allowed to prepare for trial, where it appears that accused has been adequately represented by counsel at the trial, or where it does not appear that, if the case had been continued, counsel would, at a later date, have been any better prepared to go to trial.

"However, all persons accused of crime, and their counsel, are entitled to a reasonable time in which to prepare for a trial after an accusation of crime is made * * * and, where no lack of diligence is shown, either on the part of accused or of his counsel, and it is clear that counsel has had insufficient time to prepare, a continuance should be granted, or at least an offer should be made to postpone the trial for a reasonable time. Especially is this true where counsel is appointed by

the court, in which case greater indulgence should be allowed.''

In Cruthirds v. State, 190 Miss. 892, 896, 2 So. 2d 145 (1941), the Court held that under the provision of the state constitution guaranteeing a fair and impartial trial, a ''fair and impartial trial'' includes a reasonable opportunity to prepare for trial. In its opinion in that case the Court said: ''Section 26 of the Constitution of Mississippi guarantees to every person a fair and impartial trial. A fair and impartial trial includes a reasonable opportunity to prepare for trial. Reed et al. v. State, 94 Fla. 32, 113 So. 630; State v. Collins, 104 La. 629, 29 So. 180, 81 Am. St. Rep. 150; State v. Kilmer, 31 N. D. 442, 153 N.W. 1089, Ann. Cas. 1917E, 116; State v. Fairclough, 86 Utah, 326, 44 P. 2d 692; Cade v. State, 96 Miss. 434, 50 So. 554; Knox v. State, 97 Miss. 523, 52 So. 695; State v. Musselman, 101 Wash. 330, 172 P. 346, L.R.A. 1918E, 523, and annotations to that case. In Coker v. State, 82 Fla. 5, 89 So. 222, the court set forth the right in these words: 'Justice requires, and it is the universal rule, observed in all courts of this country, it is most sincerely to be hoped, that reasonable time is afforded to all persons accused of crime in which to prepare for their defense. A judicial trial becomes a farce, a mere burlesque, and in serious cases a most gruesome one at that, when a person is hurried into trial upon an indictment charging him with a high crime, without permitting him the privilege of examining the charge and time for preparing his defense * * *. 'Even the state is given a reasonable opportunity to prepare for the prosecution. Ex parte Jefferson, 62 Miss. 223.'

''It is true that granting or refusing further time and continuances is largely discretionary with the trial judge, but the discretion must be a sound judicial discretion having due regard to the rights of the public and of the defendant. Section 576, Code of 1930; Jones

v. State, 168 Miss. 702, 152 So. 479; Goins v. State, 155
Miss. 662, 124 So. 785; Hodgkin v. State, 172 Miss. 297,
160 So. 562; Allgood v. State, 173 Miss. 27, 161 So. 756.
" * * *

"Dispatch of courts, saving of costs in their opera-
tion, speedy trials are commendable in the trial judges,
but zeal in these respects must have due regard for
the rights of defendants. The right is more valuable
than the saving."

In Johnson v. State, 223 Miss. 167, (173) 77 So. 2d
824 (1955), the Court said: "Appellant also assigns as
error the overruling of a motion for a continuance so
that appellant's attorney could obtain and use certain
military records, the contents of which is unknown to
this Court. While some of the judges think this was
error, it becomes unnecessary to discuss the merits of
the motion, since the question will not arise on another
trial. It is sufficient to here say that in the exercise
of the court's sound discretion, taking into consideration
all the factors properly bearing on a motion for con-
tinuance, every facility should be made available to
the accused to the end that the case can be properly
prepared and all reasonably available evidence be pre-
sented at the trial."

 █ There is nothing in the record in the case that
we have here to indicate a lack of diligence on the
part of the appellant's attorneys in the preparation
of the case for trial; and it seems clear to us that,
upon the showing made, the appellant's attorneys should
have been granted a continuance to enable them to ob-
tain, if possible, and make use of in the preparation
of the appellant's defense, if found to be helpful, copies
of the appellant's Air Force service record relating to
the examination of the appellant by the Air Force medi-
cal officers and the appellant's discharge from the Air
Force as "Undesirable to the Government," nine months
after the date of his enlistment. We have no way of

knowing what the appellant's Air Force service record would have shown, if it had been made available for inspection by the appellant's attorneys, but the appellant's attorneys were entitled to a reasonable time in which to obtain copies of the record, and, if possible, obtain statements from the medical officers who examined the appellant immediately prior to his discharge from the Air Force. Evidence showing the results of the psychiatric examination made by the Air Force medical officers, if made available for consideration by the jury, might have produced a verdict fixing the appellant's punishment as life imprisonment instead of death in the gas chamber. As stated by this Court in Johnson v. State, *supra,* in the exercise of the court's sound discretion, taking into consideration all the factors properly bearing on the motion for a continuance, every facility should be made available to the accused to the end that the case can be properly prepared and all reasonably available evidence be presented at the trial.

 ██ In the light of all the facts in the record we are of the opinion that the Court erred in overruling the defendant's motion for a continuance in this case, and for that error the judgment of the lower court must be reversed and the case remanded for a new trial.

 ██ It is next argued on behalf of the appellant that the court erred in refusing to grant the defendant's Instruction No. 3 instructing the jury to return a verdict fixing the defendant's punishment at life imprisonment. But we think there is no merit in that contention.

Mississippi Annotated Code section 2217 (1956) expressly provides: "Every person who shall be convicted of murder shall suffer death, unless the jury rendering the verdict shall fix the punishment at imprisonment in the penitentiary for the life of the convict; or unless the jury shall certify its disagreement as to the punishment as provided by section 1293 Code of 1930 [§2536

Code of 1942] in which case the court shall fix the punishment at imprisonment for life.''

In Dickerson v. State, 202 Miss. 804, 807, 808, 32 So. 2d 881 (1947), this Court has held that a trial judge cannot be compelled to accept a plea of guilty in capital cases and to pronounce a sentence less than a death sentence, in view of statutes placing the death sentence in capital cases within the sole province of the jury.

The Court in its opinion in that case said: ''In some states the statutes permit pleas of guilty in capital cases, and authorize the trial judge to impose the death penalty if upon an examination of the facts such a penalty is deserved. We have no such statute in this state. Rather, all our statutes in capital cases place the death sentence within the sole province of the jury, and no such sentence can be imposed by any judge unless he has the authority of the jury therefor. The defendant concedes that this is true * * *. We do not say that the trial judge may not accept a plea of guilty in a capital case, but if he does so he must see to it, first, that the plea is entirely voluntary and that the defendant fully realizes and is competent to know the consequences of such a plea, and second, a competent and impartial jury must be empanelled and the material circumstances of the crime must be placed before the jury with such fullness that the jury will be well advised on the issue whether they should adjudge the death sentence.''

██ █ It is next argued that the trial court erred in permitting the introduction into evidence and the examination by the jury of the book of trading stamps that were found in the pocket of the defendant's soiled clothes in Mrs. Dillard's bathroom two or three days after the disappearance of Jerry Gordon, and also the .38 Smith and Wesson revolver found in the soiled clothes basket; also photographs of the scene near where Jerry Gordon's body was found, and photographs of the victim's body. It is also argued that the court erred

in permitting the introduction in evidence of the signed statement or confession of the defendant dated February 16, 1964. But we think there was no error in the action of the trial judge in admitting in evidence the exhibits referred to.

The courts have generally held that, where the jury has the power to assess the penalty following a plea of guilty, a hearing is generally required to enable the jury to determine the punishment that should be imposed, and, in general, the rules of admissibility of evidence at such a hearing are the same as those applicable to a trial on a plea of not guilty. 24 C.J.S. *Criminal Law* section 1570b (2) (1961). See also cases cited.

We have examined the remaining assignments of error, but in view of the fact that a new trial is to be granted it is not necessary that we comment on any of them.

Reversed and remanded.

*Ethridge, Gillespie, McElroy and Brady, JJ.,* concur.